## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## NEWNAN DIVISION

UNITED STATES OF AMERICA          :
                                  :     CRIMINAL ACTION
v.                                :     NO. 3:15-cr-00010-TCB-RGV
                                  :
SHAWUANA N. SANDERS, *et al.*,     :


## MAGISTRATE JUDGE'S FINAL REPORT,
## RECOMMENDATION, AND ORDER

Defendant Shawuana N. Sanders ("Sanders"), is charged along with co-defendants Monica L. Person ("Person") and Tania M. Zelada ("Zelada"), in a ninety-nine count indictment with conspiracy, and multiple counts of wire fraud, mail fraud, aggravated identity theft, and theft of government money, arising out of a fraudulent tax scheme in which the defendants allegedly obtained and used the identities of other living and deceased individuals to file, either electronically or through the mail, fraudulent tax returns with the Internal Revenue Service ("IRS"), thereby converting to their own use money and property of the United States, in violation of 18 U.S.C. §§ 2, 287, 371, 641, 1028A(a)(1), 1341, and 1343.  [Doc. 1]. Sanders has filed a motion to dismiss the indictment and an amended motion to dismiss the indictment, [Docs. 28 & 36], as well as a motion to suppress evidence illegally seized during the execution of a search warrant, [Doc. 25], all of which the

government opposes, [Docs. 41 & 42].[1]   For the reasons that follow, it is

**RECOMMENDED** that these pending motions, [Docs. 25, 28, & 36], be **DENIED**.

## I. STATEMENT OF FACTS

A.   <u>The June 21, 2011, Search of Sanders' Residence Pursuant to the June 17, 2011, Search Warrant</u>

On June 17, 2011, Special Agent Brian P. Slemons ("Agent Slemons"), who at

the time was with the Criminal Investigation Division of the IRS, applied for and

received a search warrant for Sanders' residence located at 3 Renwick Drive, in

Senoia, Georgia.  [Docs. 41-1 & 41-2].  In the affidavit in support of the application

for the search warrant, Agent Slemons recounted his employment history, [Doc. 41-2

at 2], and he then detailed an investigation that began in early May 2011, involving

"a series of fraudulent federal income tax returns that were filed with the IRS," [<u>id.</u>

---

[1] Sanders also filed a motion to sever her trial from the trial of her co-defendants based on <u>Bruton v. United States</u>, 391 U.S. 123 (1968), because both Zelada and Person have given statements "that are tantamount to confessions," among other arguments.  [Doc. 26 at 1].  Co-defendant Zelada entered a guilty plea on August 24, 2015, <u>see</u> [Doc. 43], but a potential <u>Bruton</u> issue remains with respect to co-defendant Person, who did not file any pretrial motions and is therefore ready to be certified for trial, <u>see</u> [Docket entry dated 08/05/2015].  Because Sanders' motion raises a potential, yet premature <u>Bruton</u> issue that could impact the scheduling of trial, the motion to sever, [Doc. 26], is hereby **DEFERRED** to the Honorable Timothy C. Batten, Sr., the United States District Judge assigned to this case.

at 3 ¶ 6].[2]  He explained that as of the date of the affidavit, he, along with the IRS

Atlanta Scheme Development Center, "identified approximately 700 fraudulent

income tax returns claiming refunds in excess of $2.8 million," that these "tax

returns were determined to be related to a single scheme as they share common

addresses, refund amounts, and/or IP addresses,"[3] and that of the approximate 700

returns filed, 603 returns were filed in the names of deceased individuals.  [Id.].[4]

     During the course of the investigation, Agent Slemons discovered that the 646

electronically filed tax returns were "transmitted through various IP addresses

between . . . January 6, 2011 and June 1, 2011," and that Comcast Communications

---

[2] Agent Slemons averred that the information set forth in his affidavit was a "combination of [his] personal knowledge of [the] investigation, the knowledge of other duly sworn law enforcement officers or agents, documents obtained from the Georgia Department of Motor Vehicles, and information obtained from third-party witnesses."  [Doc. 41-2 at 2 ¶ 2].

[3] Agent Slemons defined an IP address, which is an abbreviation for "Internet Protocol address," as a "unique number used by a computer to access the Internet," and he explained that IP addresses "can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet," but that it could also be "static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet."  [Doc. 41-2 at 13 ¶ g].

[4] Agent Slemons detailed that 646 of the returns were electronically filed and that the remainder were "paper returns filed via the U.S. Mail."  [Doc. 41-2 at 3 ¶ 6]. He also detailed that "all of the electronically filed returns were filed in 2011 for tax year 2010," and that the "paper returns were filed during 2010 and 2011 for tax years 2007 through 2010."  [Id.].

provided records for one such IP address bearing the number 66.56.23.102, which showed that between January 6, 2011, and March 27, 2011, "this IP address was in use by the residential internet service account of Sanders."  [Id. at 3 ¶ 8].  Agent Slemons averred that during that time period, "196 federal income tax returns were filed from that particular IP address."  [Id.].[5]  Agent Slemons also explained that another IP address, 76.105.70.57, was also used to transmit 28 federal tax returns, and that Comcast subscriber records showed that "between the dates of March 30, 2011 and April 13, 2011, the IP address was in use by the residential internet service account of Sanders, with a service address of 3 Renwick Drive[.]"  [Id. at 3-4 ¶ 9].[6]

---

[5] Agent Slemons explained that from January 6, 2011, until January 24, 2011, the service address for that account was 85 Mulberry Drive, Senoia, Georgia 30276, but that on January 24, 2011, the service was transferred to 3 Renwick Drive, Senoia, Georgia 30276, from which 164 tax returns were transmitted.  [Doc. 41-2 at 3 ¶ 8].  Agent Slemons relayed that Sanders resided at the Renwick address.  [Id. at 3 ¶ 7].

[6] Agent Slemons summarized that in total, 192 tax returns were known to have been transmitted from IP addresses assigned to the subject residence, and that on these returns, the following fraud indicators exist: (1) 165 of these returns were filed using the identities of deceased individuals; (2) 167 of these returns were filed claiming a deceased individual as a dependant brother or sister; (3) 180 of these returns reported HSH wages, which are defined by the IRS as wages received as a household employee for which no accompanying documentation was required; (4) 166 of these returns contain HSH wages ranging between $9,100 and $9,999 and federal withholding of $0; (5) all of the returns listed the taxpayer's occupation as either "Barber," "Caregiver," "Accountant," or "Construction"; (6) 51 of the returns were filed using the address of 1315 Ingersoll Drive, Phenix City, Alabama 36867, which was used by Sanders as recently as 2010, with 50 of these 51 returns being filed on behalf of deceased individuals; and (7) a sole return was filed using the address of 55 Scott Street, Buford, Georgia 30518, which belonged to a company that

Agent Slemons detailed that Sanders' 2010 income tax return revealed that her only income was HSH wages of $12,540.00, with a listed occupation as "Caregiver," and that this return was transmitted through the IP address of 66.56.23.102, associated with Sanders and the subject residence, and the residential address was also listed on the return as Sanders' address.  [Id. at 5 ¶ 13].

Based on this information, Agent Slemons averred that he believed that Sanders resided at the subject residence and that evidence of the crimes of conspiracy to defraud the government; false, fictitious or fraudulent crimes; and "[f]raud and related activity in connection with identification documents, authentication features, and information" would be found at that residence.  [Id. at

---

employed Latoya Edwards ("Edwards"), an acquaintance of Sanders, with an additional 223 returns, using the identity of deceased individuals, having been filed using this company address from IP address 75.131.197.41, which was in use by the residential service account of Jillian Ford ("J. Ford"), with a service address of 4876 Gathering Place, Suwanee, Georgia.  [Doc. 41-2 at 4-5 ¶ 10].  Agent Slemons explained that Sanders had been identified as an associate of Annette Ford ("A. Ford"), the mother of Edwards and J. Ford, and that an April 14, 2011, search warrant executed by the Duluth Police Department at A. Ford's residence yielded "documentation of thousands of stolen identities along with hundreds of false income tax returns," which led to A. Ford's arrest and subsequent incarceration on federal charges of conspiracy and aggravated identity theft.  [Id. at 5 ¶ 11].  Agent Slemons explained that although A. Ford entered a guilty plea on June 13, 2011, and was subsequently interviewed but did not volunteer any information and was not asked about Sanders, investigation revealed that Sanders had made a cash deposit of $11,350 into an account bearing the name of J. Ford on March 2, 2011.  [Id. at 5 ¶¶ 11-12].  Agent Slemons also explained that while incarcerated, A. Ford placed calls to Sanders, and the recordings reflect that they discussed Sanders assisting A. Ford and J. Ford in paying their bills while A. Ford was incarcerated.  [Id. at 5 ¶ 14].

2 ¶ 5, 5 ¶ 15].  Agent Slemons again averred that 192 tax returns were filed from IP addresses assigned to Sanders at the subject residence, and "so the computer or computers used to file those returns, as well as other evidence related to the offenses [was] likely to be found at the Premises."  [Id. at  5-6 ¶ 15].[7]  He therefore sought permission to "seize any computer hardware, computer software, and computer-related documentation" located at the subject residence as described in Attachment A,[8] "to initially conduct, to the extent necessary and possible, an on-site preview, and subsequently, to conduct an off-site, thorough forensic analysis, by using

---

[7] Agent Slemons added that "based on [his] training and experience, individuals involved in a false refund scheme are likely to keep proceeds of the scheme, property derived from the proceeds, and records and other evidence related to the proceeds and transactions with the proceeds in their residence and vehicles." [Doc. 41-2 at 6 ¶ 15].

[8] Attachment A identifies the place to be searched as the residence located at 3 Renwick Drive, Senoia, Georgia 30276, along with "any abutting yard and any other structures on the property," and included the following description:

> This residence is a two-story single family home.  It is located on the northeast corner of Renwick Drive and Tudor Way, with a black front door facing Tudor Way.  The home has a combination of brick and siding on the front side.  The siding is a light green in color and the bricks are a light brown in color.  The municipal address number three appears on the top of the mailbox which is at the base of the driveway on the Renwick Drive side of the residence.  There is a white garage door at the top of this driveway.  The residence has a privacy-fenced backyard.  This address is within the Northern District of Georgia.

[Doc. 41-2 at 10].

6

whatever data analysis techniques may be necessary to seize the evidence, fruits, and instrumentalities listed in Attachment B."[9]  [Id. at 9 ¶ 20 (footnote added)].

---

[9] Attachment B describes the items to be seized as "fruits, instrumentalities, and evidence of crimes" of conspiracy to defraud the government; false, fictitious or fraudulent claims; and "[f]raud and related activity in connection with identification documents, authentication features, and information," including: (1) originals or copies and electronically-filed versions of completed federal and state income tax returns for the tax years from 2007 through 2010, as well as any documents used in the creation of these returns; (2) records identifying the taxpayers for whom tax returns for tax years 2007 through 2010 have been prepared, including any list of identities or information linked to the source of identity used in the preparation of the tax returns; (3) records related to federal income tax refunds, including amounts received during 2007 to the present, as well as any documents identifying the location or parties responsible for the receipt and/or negotiation of income tax refund checks; (4) financial records, including bank account records, bank statements, deposit statements, receipts, ledgers, cash receipt books, checks, check books, canceled checks, check registers, withdrawal slips, wire transfers, cashier's checks, money orders, securities records, credit applications, loan documents and payments, invoices or bills, payroll records, currency, and safe deposit box records and keys; (5) computer-related items, including documentation, cameras, passwords and data security devices, telephones, cellular phones, and electronic storage devices, as well as any computer equipment and storage device capable of being used to commit the offenses, further the activity, or store evidence or to facilitate the transmission, creation, display, encoding, or storage of data; any magnetic, electronic, or optical storage device capable of storing data; any documentation, operating logs, and reference manuals regarding the operation of the computer equipment; any applications, utility programs, or other software used to facilitate direct or indirect communication with the computer equipment; any physical keys, encryption devices, or similar items necessary to gain access to the computer equipment; and any passwords necessary to access the computer equipment; and (6) "[e]vidence in whatever form and by whatever means it may have been created or stored," whether in computer or electronic storage, handmade form, mechanical form, and video, image, or photographic form.  [Doc. 41-2 at 11-12].

Based on these facts, United States Magistrate Judge C. Christopher Hagy signed the search warrant on June 17, 2011, authorizing law enforcement to search the entire premises and curtilage located at 3 Renwick Drive as fully described in Attachment A, for the items described in Attachment B, on or before June 30, 2011. [Doc. 41-1 at 1].  The agents executed the warrant on the morning of June 21, 2011, see [Doc. 41-3 at 1], and on the following day, Agent Slemons signed the search warrant return and filed it with the Court, along with an inventory of the seized items, [id. at 1-4].[10]

## B.   The April 28, 2015, Criminal Indictment

On April 28, 2015, a grand jury in this district returned an indictment against Sanders, Person, and Zelada, charging them with one count of conspiring with each other and others known and unknown, to knowingly devise and participate in a scheme and artifice to defraud by means of materially false and fraudulent pretenses, representations, and promises by knowingly presenting to an agency of the United States materially false claims against the United States in order to convert to their own use and the use of another money and property belonging to the United States, and in doing so, to cause the United States Postal Service and other interstate

---

[10] Sanders was not arrested on the day the search warrant was executed. [Doc. 36-2 at 1 ¶ 6].  Rather, she was arrested on May 11, 2015, after the indictment was returned.  [Doc. 18].

carriers, as well as interstate wire communications, to be used in the transmission of things in furtherance of the scheme, in violation of 18 U.S.C. §§ 287, 641, 1341, and 1343.  [Doc. 1].[11]

According to the indictment, Sanders and Person obtained personal identifying information belonging to other individuals, many of whom were deceased, from the web site www.ancestry.com, and subsequently filed "false and fraudulent federal income tax returns in the individuals' names."  [Id. at 2-3].  They filed many of these returns electronically with the IRS, "which caused false claims to be transmitted to the IRS by interstate wire communications," and they also filed returns by mail to an IRS processing center.  [Id. at 3].  As a result, this alleged scheme "resulted in over $2 million in tax refunds being paid by the IRS," with said

_____

[11] In addition, Sanders and Person are charged with twenty-eight counts of wire fraud in relation to fraudulent tax returns filed between April 28, 2010, and March 26, 2011, in violation of 18 U.S.C. §§ 1343 and 2; fourteen counts of mail fraud for fraudulent tax returns filed between December 20, 2010, and March 3, 2011, in violation of 18 U.S.C. §§ 1341 and 2; and forty-two counts of aggravated identity theft for unlawfully using the identities of others during and in relation to the commission of a felony occurring on and between April 28, 2010, and March 26, 2011, in violation of 18 U.S.C. §§ 1028A(a)(1) and (2).  [Doc. 1 at 4-11].  Further, Sanders, Person, and Zelada are charged with seven counts of theft of government money in relation to tax refunds issued on and between March 11, 2011, and April 8, 2011, in violation of 18 U.S.C. §§ 641 and 2, [id. at 12], and Zelada is charged with seven counts of aggravated identity theft for unlawfully using the identities of others during and relation to the commission of a felony occurring on and between March 11, 2011, and April 8, 2011, in violation of 18 U.S.C. §§ 1028A(a)(1) and 2, [id. at 13].

refunds being mailed to addresses associated with Sanders and Person.  [Id.].  After the IRS mailed the refunds, Zelada, who was an employee of Columbus Bank and Trust, a division of Synovus Bank, cashed the fraudulent refund checks, or instructed other employees to negotiate the fraudulent checks, and she was subsequently paid by Sanders and Person for her role in the scheme.  [Id. at 3-4].

Sanders has filed pretrial motions in relation to the search warrant executed at her residence and the instant criminal indictment, see [Docs. 25, 28, & 36], all of which the government has opposed, see [Docs. 41 & 42].  Sanders did not file any reply briefs in support of her pending motions, and these motions are now ripe for ruling.

## II.  DISCUSSION

### A.    Motions to Dismiss the Indictment, [Docs. 28 & 36]

Sanders moves to dismiss the April 28, 2015, indictment due to the alleged inexcusable delay in "indicting and arresting [her, which] occurred over four [] years after the most recent alleged offense and nearly four [] years after her home was raided."  [Doc. 36-1 at 8-9].  Sanders asserts that she has been prejudiced since "co-defendants and [her estranged husband], who initially gave conflicting stories, [have had] a chance to now change their stories over the years," [id. at 9],[12] and that the

_____

[12] With regard to her estranged husband, Jason Sanders, Sanders also asserts that she was unaware he was "being coaxed over the years by the Government to

"amount of time [that has passed] has allowed many witnesses to become unavailable," [id.].  Sanders moves to dismiss the indictment based on Rules 48 and 50 of the Federal Rules of Criminal Procedure, Local Criminal Rule 50.1 and Appendix C, the Sixth Amendment right to a speedy trial, and the Fifth Amendment right to due process.  See generally [Doc. 36-1].

In response, the government asserts that insofar as Sanders' motion is based on Rules 48 and 50 of the Federal Rules of Criminal Procedure, as well as the companion Local Rule 50.1, and the Sixth Amendment, it should be denied as those provisions do not apply to pre-arrest or pre-indictment delay.  [Doc. 42 at 3-5].[13]  The

---

testify against [her]," and that had she known he "would be taking this vengeful action, she could have instituted formal divorce proceedings and fleshed out all of his wrongdoing during a time when evidence was fresh."  [Doc. 36-1 at 10].

[13] The Court agrees that insofar as Sanders' motion is brought  pursuant to Rules 48(b) and 50 of the Federal Rules of Criminal Procedure, this Court's Local Rule 50.1, and the Sixth Amendment, it is due be denied for the reasons discussed in the government's opposition.  See [Doc. 42 at 3-5].  Indeed, since Sanders was not arrested until after the indictment was returned, [Docs. 18 & 36-2 at 1 ¶ 6], "this is not a 'post-arrest situation' to which Rule 48(b) applies," United States v. Reme, 738 F.2d 1156, 1164 (11th Cir. 1984), and similarly, Rule 50, which provides that "[s]cheduling preference must be given to criminal proceedings as far as practicable," see Fed. R. Crim. P. 50, contemplates the scheduling of criminal proceedings after a criminal prosecution has begun and does not involve any pre-indictment delay.  Likewise, "[t]he protections of the Sixth Amendment are activated only when a criminal prosecution has begun," Reme, 738 F.2d at 1162 (citation and internal marks omitted), and "the speedy trial guarantee of the Sixth Amendment does not apply to preindictment delay," United States v. Caporale, 806 F.2d 1487, 1514 (11th Cir. 1986); see also United States v. Lamb, 214 F. App'x 908, 914 (11th Cir. 2007) (per curiam) (unpublished).  Sanders challenges the delay that occurred

government also asserts that the indictment was brought within the applicable five-year statute of limitations,[14] and that Sanders' due process arguments are without merit because she has failed to show that she has been prejudiced by the delay, or to allege that any pre-indictment delay was the result of bad faith or deliberate action by the government.  [Id. at 6-11].  Finally, the government maintains that

_____

between the alleged commission of the criminal offenses and her indictment, and she has not made any arguments about any delay occurring after her indictment and arrest.  See generally [Doc. 36-1].  Thus, the Court will only address whether dismissal for pre-indictment delay is warranted under the Fifth Amendment's Due Process Clause.

[14] Sanders initially argued that the indictment, which alleges that the crimes at issue began in January 2008 and continued through June 2011, should be dismissed "on the grounds that the statute of limitations had passed on any alleged crimes occurring earlier than April 28, 2010," [Doc. 28 at 1]; however, at the pretrial conference, the government pointed out that the law in this Circuit is that for a conspiracy prosecution, the indictment satisfies the statute of limitations if the conspiracy is alleged to have continued into the limitations period, see [Doc. 29]; see also United States v. Abdi, Criminal Case No. 1:13–cr–484–JEC–RGV, 2014 WL 3828165, at *4 (N.D. Ga. Aug. 4, 2014), adopted at *1 (alteration in original) (citation and internal marks omitted) ("Though the conspiracy began outside the limitation period, the conspiracy continued and overt acts were committed within the limitation period and [t]his is sufficient."), and the Court therefore directed Sanders to perfect her motion to dismiss, see [Doc. 29].  On July 10, 2015, Sanders perfected her motion, see [Doc. 36], and she no longer makes any arguments with respect to the statute of limitations, see generally [id.].  Accordingly, her statute of limitations argument is deemed abandoned.  See United States v. Cadet, Criminal Action Nos. 1:11–CR–00522–WBH–LTW, 1:11–CR–00113–WBH–LTW, 2013 WL 504892, at *9 (N.D. Ga. Jan. 16, 2013), adopted by 2013 WL 504815, at *1 (N.D. Ga. Feb. 8, 2013), aff'd, 574 F. App'x 917 (11th Cir. 2014) (per curiam) (unpublished).

"[b]ecause Sanders has offered only conclusory allegations of prejudice and bad faith, she is not entitled to a hearing on her motion."  [Id. at 11 (citations omitted)].

The general statute of limitations for non-capital federal offenses such as those charged in the present indictment is five years.  See 18 U.S.C. § 3282(a) ("Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years next after such offense shall have been committed.").  "The statute of limitations is the primary safeguard against the government bringing stale criminal charges, but when a defendant establishes substantial prejudice, due process may require the dismissal of an otherwise timely indictment if the delay was the product of a deliberate act by the government to gain a tactical advantage."  United States v. Ramirez, 491 F. App'x 65, 70 (11th Cir. 2012) (per curiam) (unpublished) (internal citations omitted).  Thus, to prevail on a due process violation claim, Sanders must show that "pre-indictment delay (1) caused actual prejudice to the conduct of [her] defense, and (2) was the product of deliberate action by the government designed to gain a tactical advantage."  United States v. Jones, 592 F. App'x 920, 921 (11th Cir. 2015) (per curiam) (unpublished) (emphasis added) (citation omitted).[15]  "Because

---

[15] Despite Sanders' assertion that the "length of delay was presumptively prejudicial to [her]," [Doc. 36-1 at 8], "the law in this circuit is that prejudice will not be presumed because of a lengthy delay," United States v. Williams, Criminal Case Nos. 1:11–CR–547–ODE–ECS, 1:12–CR–80–ODE–ECS, 2012 WL 5845004, at *1 (N.D.

[Sanders] does not argue that the applicable statute[] of limitations barred [her] prosecution, [s]he shoulders the burden of show[ing] that pre-indictment delay was deliberate for the purpose of tactical advantage." Ramirez, 491 F. App'x at 70 (last alteration in original) (citation and internal marks omitted). "The burden of satisfying the 'tactical advantage' test rests with [Sanders], and that burden has been characterized as a 'heavy' one."[16] United States v. Stoll, No. 10–60194–CR, 2011 WL 939251, at *7 (S.D. Fla. Feb. 16, 2011), adopted by 2011 WL 765949, at *1 (S.D. Fla. Feb. 25, 2011) (citation omitted). "Indeed, so 'rare' are dismissals for pre-indictment delay that [the Eleventh Circuit] [] remarked that it had 'never concluded that such a dismissal was appropriate.'" Id. (quoting United States v. Foxman, 87 F.3d 1220, 1224 n.4 (11th Cir. 1996)).[17]

---

Ga. Nov. 16, 2012) (citations and internal marks omitted). Moreover, with respect to the second prong, "simply gaining a tactical advantage is not enough" as the "tactical advantage must be the result of deliberate action by the government toward that end." Jones, 592 F. App'x at 922 (citation omitted). "Both prongs of [the] test must be satisfied to make relief available to a defendant[.]" United States v. Hawes, No. 5:14–CR–397–RDP–TMP, 2015 WL 4067331, at *2 (N.D. Ala. July 1, 2015) (citation omitted).

[16] Moreover, it is not necessary to address the prejudice prong if Sanders fails to carry her burden with respect to the deliberate-delay prong. United States v. Baez-Hernandez, No. 8:14–CR–64–T–17TGW, 2014 WL 2612066, at *2 (M.D. Fla. June 11, 2014) (citation omitted).

[17] Although the Court finds that Sanders has failed to meet the second prong of the analysis, and therefore need not address her arguments with regard to prejudice, the Court will nevertheless briefly discuss all of her arguments.

14

Sanders "must demonstrate *actual* prejudice and not merely the real possibility of prejudice inherent in any extended delay." <u>United States v. Heard</u>, No. 1:12–cr–40 (WLS), 2013 WL 1966299, at *3 (M.D. Ga. May 10, 2013) (citations and internal marks omitted).  Sanders asserts that "[h]ad the [g]overnment arrested or indicted [her] when the alleged offenses were fresh, [she] would have been able to present an adequate defense before it became spoiled by years of undue delay." [Doc. 36-1 at 4-5 (footnote omitted)].  In particular, she claims that the "amount of time has allowed many witnesses to become unavailable," and allowed co-defendants and her estranged husband to change their stories.  [<u>Id.</u> at 9].  However, "speculative allegations, such as general allegation of loss of witnesses and failure of memories, are insufficient to demonstrate . . . actual prejudice[.]" <u>Heard</u>, 2013 WL 1966299, at *3 (first alteration in original) (citation and internal marks omitted).  Indeed, a "defendant seeking dismissal of [an] indictment must generally demonstrate, with specificity, the expected content of [unavailable] witnesses' testimony." <u>United States v. Campbell</u>, No. 1:04–CR–0424–RWS, 2005 WL 6436621, at *5 (N.D. Ga. Oct. 24, 2005) (second alteration in original) (citation and internal marks omitted). Sanders has not even identified any "unavailable" witnesses, much less offered with any specificity the expected testimony of these unidentified witnesses.  And she certainly has failed to "offer any evidence that the loss of those

[unidentified] witnesses impacts her ability to provide a meaningful defense."
United States v. Rivera, No. CR209–14, 2009 WL 2390847, at *3 (S.D. Ga. July 9, 2009),
adopted by 2009 WL 2422211, at *1 (S.D. Ga. Aug. 4, 2009) (citation omitted).

Sanders also asserts that her co-defendants and estranged husband have
changed their stories over the years, thereby prejudicing her, but she again has failed
to offer any specificity as to how she was actually prejudiced, and the "mere
possibility of prejudice . . . is not sufficient to establish a due process violation, and
the[se] general claims of prejudice . . . are insufficient to satisfy [Sanders']
'exceedingly high' burden of showing actual prejudice resulting from the delay."
United States v. Jones, No. CR406-38, 2006 WL 1653762, at *2 (S.D. Ga. June 7, 2006),
adopted at *1; see also United States v. Rice, 550 F.2d 1364, 1369 (5th Cir. 1977)
(affirming denial of evidentiary hearing on alleged pre-indictment delay where there
was a lack of supporting evidence).[18] More importantly, Sanders conclusory claims
of prejudice that "[h]ad [she] known she would be a suspect, she could have
interviewed these witnesses herself, or with counsel," or "would have taken action
sooner to protect her constitutional interest," [Doc. 36-1 at 9-10 (citation omitted)],
are rendered implausible because, as the government points out, see [Doc. 42 at 9],

---

[18] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding
precedent of the Eleventh Circuit.  Bonner v. City of Prichard, Ala., 661 F.2d 1206,
1209 (11th Cir. 1981) (en banc).

she has been aware of the criminal investigation since June 2011, when federal agents executed the search warrant at her residence, see [Docs. 41-1 & 41-2], after which she "retained counsel promptly," who even "followed up with the [g]overnment in April of 2012 . . . as to when [Sanders] would be indicted," [Doc. 36-1 at 4 & n.1].  Thus, Sanders has failed to show how any delay in bringing the indictment hindered her from "protect[ing] her constitutional interest."  [Id. at 10 (citation omitted)].  Accordingly, the Court finds that the alleged prejudice in this case fails to "rise to constitutional proportions [necessary] to support dismissal." United States v. Keel, 254 F. App'x 759, 760 (11th Cir. 2007) (per curiam) (unpublished) (internal marks omitted) (quoting United States v. Benson, 846 F.2d 1338, 1342 (11th Cir. 1988)).

Furthermore, "substantial prejudice from delay, standing alone, does not violate due process." Williams, 2012 WL 5845004, at *2 (alteration omitted) (citation and internal marks omitted).  That is, "[e]ven if [Sanders could] make the necessary showing of prejudice from the delay, [t]he delay must also be the product of a deliberate act by the government designed to gain a tactical advantage," and "[m]any delays in obtaining an indictment would not be tactical– a word which [the Eleventh Circuit has interpreted as] inherently includ[ing] the concept of intentionally maneuvering for an advantage at trial."  Id. (third alteration in

original) (citations and internal marks omitted).  "[W]here the record shows no reason for the delay (or where delay is due to simple negligence), no due process violation exists."  Id. (citation and internal marks omitted).

Sanders asserts that the government "deliberately chose to delay arrest and indictment of [her], while bolstering its case in the interim, behind the scenes," [Doc. 36-1 at 4], and that the government "simply had no reason to delay the arrest or indictment . . . for so long, except to gain [an] unfair advantage," [id. at 11]. However, Sanders has not shown that the government "deliberately sought a tactical advantage by delaying the indictment," but instead, has simply shown, at most, that "the delay– combined with [some speculative] prejudice to [her] . . . gave the government a tactical advantage"; however, "simply gaining a tactical advantage is not enough."  Jones, 592 F. App'x at 922 (citation omitted).  Indeed, even if Sanders' "assertion that the delay has given the [g]overnment a tactical advantage" is true, it "does not satisfy her duty to show that the [g]overnment deliberately delayed the indictment to gain a tactical advantage."  Rivera, 2009 WL 2390847, at *2; see also Lamb, 214 F. App'x at 912.  "Furthermore, the [g]overnment does not have the burden of coming forward with a reason for the delay," United States v. Pompano Helicopters, Inc., No. 08-60279-CR, 2009 WL 1456745, at *4 (S.D. Fla. May

22, 2009), adopted at *1 (citation omitted),[19] and Sanders simply "fails to identify facts that would tend to prove that the government acted in bad faith or made a deliberate decision to gain a tactical advantage over [her] that led to the delay," Ramirez, 491 F. App'x at 70.  In sum, Sanders' "claim of any [g]overnment intent to obtain a tactical advantage is speculation," id. (internal marks omitted), and it is therefore **RECOMMENDED** that Sanders' motions to dismiss the indictment, [Docs. 28 & 36], be **DENIED**.

**B.**   **Motion to Suppress Evidence obtained from the Search of Sanders' Residence, [Doc. 25]**

Sanders argues that the June 17, 2011, search warrant for her residence was invalid because the affidavit upon which it was obtained lacked sufficient probable cause to conclude that the property sought to be seized would be located in her residence during the execution of the search warrant, that the "affidavit on the basis of which the warrant was issued does not set forth facts establishing the source of the information alleged in the affidavit," that the search warrant "failed to describe with sufficient particularity [the] place to be searched and the property to be seized," that there was an "unreasonable lapse of time between the date the information alleged in the affidavit was acquired and the date the warrant was issued" and the

---

[19] In fact, a "prosecutor need not seek an indictment until he is satisfied that he can prove guilt beyond a reasonable doubt." United States v. Solomon, 686 F.2d 863, 872 (11th Cir. 1982) (citation omitted).

information was therefore stale, and the warrant "was not obtained and executed in conformity with the requirements of Rule 41 in that the officer present during the execution of the warrant did not prepare and verify an inventory of the property seized in the presence of another officer and the person, Jason Sanders, from whose premises the [evidence] was taken." [Doc. 25 at 2 (citation omitted)]. The Court will address each of these arguments in turn.

### 1.   *Probable Cause*

The Eleventh Circuit has explained the Court's review of the sufficiency of a search warrant as follows:

> When called upon by law enforcement officials to determine the legitimacy of search warrants and their supporting affidavits, issuing magistrates and reviewing courts alike must strike a delicate balance between constitutional guarantees against excessive intrusions into areas of individual freedom and the Government's need to access and to secure relevant evidence in criminal prosecutions. In particular, issuing magistrates are given the unenviable task of making "firing line" decisions that attempt to encourage availment of the warrant process while simultaneously striving to protect citizens from unwarranted governmental interference. In recognition of the difficulty inherent in discharging this responsibility, reviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.

United States v. Miller, 24 F.3d 1357, 1363 (11th Cir. 1994). "The Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which

the warrant is requested." United States v. Betancourt, 734 F.2d 750, 754 (11th Cir.

1984) (citing Zurcher v. The Stanford Daily, 436 U.S. 547, 558 (1978)); see also Cadet,

2013 WL 504892, at *4.  That is, "[p]robable cause to search a residence requires some

nexus between the premises and the alleged crime." United States v. Joseph, 709

F.3d 1082, 1100 (11th Cir. 2013) (citation and internal marks omitted).  "Probable

cause deals 'with probabilities [which are]  . . . the factual and practical

considerations of everyday life on which reasonable and prudent men, not legal

technicians, act.'" Illinois v. Gates, 462 U.S. 213, 241 (1983) (quoting Brinegar v.

United States, 338 U.S. 160, 175 (1949)); see also United States v. Spann, No.

15–20070, 2015 WL 1969111, at *3 (S.D. Fla. May 1, 2015).

"Courts reviewing the legitimacy of search warrants should not interpret

supporting affidavits in a hypertechnical manner." Miller, 24 F.3d at 1361 (citation

omitted).  Instead, "a realistic and commonsense approach should be employed so

as to encourage recourse to the warrant process and to promote the high level of

deference traditionally given to magistrates in their probable cause determinations."

Id. (citations omitted); see also United States v. McCullough, Criminal Indictment

No. 1:11–CR–136–JEC/AJB–01, 2012 WL 11799871, at *13 (N.D. Ga. Oct. 9, 2012),

adopted by 2014 WL 3955556, at *2 (N.D. Ga. Aug. 13, 2014).  Furthermore, "[t]he

fact than an innocent explanation may be consistent with the facts alleged . . . does

not negate probable cause." United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985)

(citations omitted); see also Adams v. Williams, 407 U.S. 143, 149 (1972) (citation

omitted).

Contrary to Sanders' contention, Agent Slemons' affidavit alleged sufficient

facts to establish probable cause to believe that evidence of a crime would be found

in her residence.  Agent Slemons relayed that 192 fraudulent federal income tax

returns were filed from an IP address associated with Sanders' residence, and that

of those returns, 165 were filed using the identities of deceased individuals.  See

[Doc. 41-2 at 3-5 ¶¶ 8-10].  He detailed the investigation and averred that these 192

fraudulent tax returns were linked to a single scheme, involving "approximately 700

fraudulent income tax returns claiming refunds in excess of $2.8 million," [id. at 3

¶ 6], and he recounted that an associate of Sanders, A. Ford, had been arrested on

federal charges of conspiracy and aggravated identity theft, that she subsequently

plead guilty on June 13, 2011, and that she had been in touch with Sanders about

Sanders assisting A. Ford's daughter with bills while she was incarcerated, [id. at 5

¶¶ 11-12, 14].  Based on his training and experience, Agent Slemons averred as

follows:

> I believe there is probable cause that Sanders is residing at the Premises
> and that evidence, fruits, and instrumentalities of the previously
> mentioned offenses will be found at the Premises.  One hundred and
> ninety-two tax returns were filed from IP addresses assigned to

> Sanders at the Premises and so the computer or computers used to file those returns, as well as other evidence related to the offenses is likely to be found at the Premises. Additionally, . . . individuals involved in a false refund scheme are likely to keep proceeds of the scheme, property derived from the proceeds, and records and other evidence related to the proceeds and transactions with the proceeds in their residence and vehicles.

[Id. at 5-6 ¶ 15]. He also averred that because "a computer or computers was used to file false tax returns, [] there is probable cause to believe that this computer or computers are located at the Premises and will contain evidence about those filings." [Id. at 6 ¶ 16a]; see also [id. at 3 ¶¶ 6, 8 (stating that 646 of the approximate 700 fraudulent returns were electronically filed between January 6, 2011, and June 1, 2011), 3 ¶ 8 (noting that 196 federal income tax returns were filed between January 6, 2011, and March 27, 2011, from an IP address associated with Sanders), 4 ¶ 9 (noting that another 28 tax returns were filed between March 30, 2011, and April 13, 2011, from an IP address associated with Sanders)].

In her bare-bones three-page motion to suppress, Sanders' sole argument with respect to probable cause is as follows:

> The alleged recordings of jail conversations were not produced in discovery, and the retrieval of such recordings by [Sanders] are unlikely given the years of delay of the Government in arresting [her]. These conversations supposedly only pertained to [her] discussing assisting [A. Ford] while [A. Ford] was incarcerated. According to [Agent Slemons], [A. Ford] did not volunteer, nor did the Government seek, information pertaining to [] Sanders at the time of the affidavit. One of the addresses that was on the alleged false returns was, as

23

[Agent Slemons] conceded, a former address of [Sanders].   [Agent Slemons] attached no records or evidence, aside from bald assertions, that false returns were filed from [Sanders'] current address.

[Doc. 25 at 2].  However, Sanders argument in this respect overlooks the fact that the "Supreme Court has warned lower courts of the error of not consider[ing an officer's] affidavit in its entirety and judging bits and pieces of information in isolation."  United States v. Lebowitz, 647 F. Supp. 2d 1336, 1345 (N.D. Ga. 2009) (alteration in original) (internal marks omitted) (quoting Massachusetts v. Upton, 466 U.S. 727, 732 (1984) (per curiam).  Sanders completely fails to acknowledge the facts set forth in the affidavit as a whole, including that 192 fraudulent federal income tax returns were filed from an IP address associated with Sanders' residence, and that of those returns, 165 were filed using the identities of deceased individuals. See [Doc. 41-2 at 3-5 ¶¶ 8-10].[20]  Thus, even without the information related to A.

_____

[20] Although Sanders challenges Agent Slemons' statements in his affidavit because he did not attach any records or evidence that the false returns were in fact filed from her current address, see [Doc. 25 at 2], all that is required is that "police [] establish probable cause to conclude that there is a fair probability that contraband or evidence of a crime will be found in a particular place," United States v. Gibson, 708 F.3d 1256, 1278 (11th Cir. 2013) (citation and internal marks omitted), and the affidavit in the present case clearly meets this standard.  In fact, the present affidavit "presented much more than conclusory, 'bare-bone' assertions for consideration by the Magistrate," United States v. Toumasian, Criminal Case No. 1:10–CR–0291–TCB–JFK–3, 2011 WL 3798223, at *9 (N.D. Ga. July 19, 2011), adopted by 2011 WL 3738980, at *5 (N.D. Ga. Aug. 22, 2011), and there is no requirement that an affiant attach "records or evidence" to a search warrant affidavit.  Rather, the affidavit need only set forth the facts upon which the affiant bases his request for a warrant, see United States v. McZilkey, No. CR 107-052, 2007 WL 3046498, at *3 (S.D.

Ford, the remaining facts in the affidavit support finding probable cause to search

Sanders' residence.  In fact, "[t]he critical element in a reasonable search is not that

the owner of the property is suspected of crime but that there is reasonable cause to

believe that the specific things to be searched for and seized are located on the

property to which entry is sought," United States v. Flores, No.

1:05-cr-558-WSD-JFK, 2007 WL 2904109, at *38 (N.D. Ga. Sept. 27, 2007), adopted at

*15 (citation and internal marks omitted), which is exactly what Agent Slemons'

affidavit established.  In short, the affidavit included sufficient information to

establish probable cause to believe that evidence of the alleged crimes would be

located in Sanders' residence.  Therefore, Sanders' contention that Agent Slemons'

affidavit did not establish probable cause is without merit.

---

Ga. Oct. 16, 2007), adopted at *1, which Agent Slemons has done.  Nor does the affidavit fail to specify the source of the information as Sanders contends.  [Doc. 25 at 2].  Indeed, Agent Slemons recited that he obtained information regarding the fraudulent tax returns from the IRS's Atlanta Scheme Development Center, [Doc. 41-2 at 3 ¶ 6], that he obtained IP address subscriber records from Comcast Communications, [id. at 3 ¶¶ 8-9], that he obtained information related to A. Ford from the Duluth Police Department and from her federal case, [id. at 5 ¶¶ 11, 14], and that the information provided in the affidavit was also based on a "combination of [his] personal knowledge of [the] investigation, the knowledge of other duly sworn law enforcement officers or agents, documents obtained from the Georgia Department of Motor Vehicles, and information obtained from third-party witnesses," [id. at 2 ¶ 2].

### 2.    *Particularity of the Place to be Searched and the Items to be seized*

Sanders contends in a single sentence that the "warrant failed to describe with sufficient particularity [the] place to be searched and the property to be seized." [Doc. 25 at 2].  However, a review of the search warrant and its attachments belies this conclusory assertion.

"The Fourth Amendment requires that a warrant particularly describ[e] the place to be searched, and the persons or things to be seized."  United States v. Bemka Corp., 368 F. App'x 941, 943 (11th Cir. 2010) (per curiam) (unpublished) (alteration in original) (citation and internal marks omitted).  "A warrant is sufficient where it describes 'the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority.'"  United States v. Aguirre, 368 F. App'x 979, 987 (11th Cir. 2010) (per curiam) (unpublished) (quoting United States v. Burke, 784 F.2d 1090, 1092 (11th Cir. 1986)).  "The particularity requirement allows a practical margin of flexibility, depending on the type of property to be seized, and 'a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit.'"  Id. at 987-88 (quoting United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir. 1982)).

Here, a detailed description of the property was attached to the warrant, and it specifically identified the address to be searched as "3 Renwick Drive, Senoia, Georgia 30276, including any abutting yard and any other structures on the property," and it described this residence as a "two-story single family home . . . . located on the northeast corner of RenWick Drive and Tudor Way, with a black front door facing Tudor Way," a "combination of brick and siding on the front side" with the siding being light green in color and the bricks light brown in color, an address number on top of the mailbox located at the base of the driveway on the Renwick Drive side of the home, a white garage door at the top of the driveway, and a privacy-fenced backyard.  [Doc. 41-1 at 3].  "The Fourth Amendment only requires that a search warrant provide a description of the premises such that an officer may with reasonable effort ascertain and identify the place intended," and here, the agents "could [] ascertain with reasonable effort the place intended to be searched." United States v. Gray, No. 10–cr–20410, 2011 WL 4368843, at *4 (S.D. Fla. May 3, 2011) (citations and internal marks omitted).  Indeed, the search warrant "contained the correct address along with a detailed description of the premises to be searched in Attachment 'A' thereto," id., and a "warrant's description of the place to be searched is not required to meet technical requirements or have the specificity sought by conveyancers," United States v. Harbison, 523 F. App'x 569, 573 (11th Cir.

2013) (per curiam) (unpublished) (citations and internal marks omitted).  Thus, the

Court finds that the search warrant and its attachment described the premises to be

searched with sufficient particularity.  See Robinson v. United States, No. 2:08-cv-

0168-MEF, 2010 WL 749895, at *3-4 (M.D. Ala. Mar. 4, 2010), adopted at *1.

Likewise, Attachment B to the warrant described in great detail the types of

items to be seized.  See [Doc. 41-1 at 4-5].  This description is not overly broad or

vague and it restricts the scope of what may be searched and seized with sufficient

particularity to enable the "searcher to reasonably ascertain and identify the things

authorized  to  be  seized."   United States v. Ortiz-Aleman, Criminal Case No.

1:11–CR–0020–ODE–JFK, 2011 WL 3739528, at *4 (N.D. Ga. July 21, 2011), adopted

by 2011 WL 3739425, at *1 (N.D. Ga. Aug. 24, 2011) (citation and internal marks

omitted);  see  also  United States v. Zellner, Criminal Indictment No.

1:09-CR-320-TCB-GGB, 2011 WL 530718, at *10 (N.D. Ga. Jan. 14, 2011), adopted by

2011 WL 529952 (N.D. Ga. Feb. 4, 2011) (citation omitted) (finding "'language []

directed to materials having a nexus to [the crime being investigated] . . . . meets the

standards of practical accuracy that enable the searcher to ascertain and identify

things authorized to be seized.'").  "Again, the [C]ourt simply does not understand

how [this] warrant[] fail[s] to adequately particularize the items to be seized," Ortiz-

Aleman, 2011 WL 3739528, at *4, and in the absence of any specific argument by

28

Sanders, <u>see generally</u> [Doc. 25], the Court concludes that the search warrant for

Sanders' residence sufficiently particularized the place to be searched and things to

be seized.[21]

_____

[21] Sanders makes several other arguments concerning the affidavit, which the Court will briefly address. She first argues that the "unreasonable lapse of time between the date the information alleged in the affidavit was acquired and the date the warrant was issued" renders the information stale. [Doc. 25 at 2]. Sanders' staleness argument, however, is without merit. Indeed, evidence of ongoing criminal activity will generally defeat a claim of staleness, <u>see</u> <u>United States v. Hooshmand</u>, 931 F.2d 725, 735 (11th Cir. 1991), and here, the affidavit alleges ongoing criminal activity between January 6, 2011, and June 1, 2011, <u>see</u> [Doc. 41-2 at 3 ¶¶ 6, 8], which was not too attenuated from June 17, 2011, the date the warrant was issued, <u>see</u> <u>United States v. Miller</u>, Criminal Action No. 4:11–CR–0044–RLV–WEJ, 2012 WL 1606043, at *5 (N.D. Ga. Mar. 26, 2012), adopted by 2012 WL 1610129, at *1 (N.D. Ga. May 7, 2012) (rejecting defendant's argument that because the most recent event cited in agent's affidavit occurred five months prior to the date the warrant was issued, the affidavit contained stale information, given the ongoing nature of the crime). Moreover, to the extent Sanders asserts that the agents waited too long to execute the warrant, <u>see</u> [Doc. 25 at 2 (noting that the warrant "was signed on June 17, 2011, and . . . was executed on June 21, 2011")], the warrant specifically authorized the agents to execute the warrant on or before June 30, 2011, <u>see</u> [Doc. 41-1 at 1], and any argument in this regard is likewise without merit. Finally, Sanders contends that the warrant "was not obtained and executed in conformity with the requirements of Rule 41," since "the officer present during the execution of the warrant did not prepare and verify an inventory of the property seized in the presence of another officer and the person, Jason Sanders, from whose premises the [evidence] was taken." [Doc. 25 at 2 (citation omitted)]. Putting aside the fact that Agent Slemons did, in fact, prepare an inventory, which he returned with the original warrant to Judge Hagy on June 22, 2011, with a notation that a copy of the warrant and the inventory was left with Jason Sanders, <u>see</u> [Doc. 41-3 at 1-4], even if Agent Slemons failed to comply with the technical requirements of Rule 41, Sanders "would not be entitled to suppression of the fruits of the search," because "[v]iolations of Rule 41(f) are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith,"

### 3. *Good Faith Exception*

Even if the search warrant in this case were found to be invalid, suppression of the evidence seized from the residence would not be warranted because the officers executing the warrant reasonably relied in good faith on the validity of the warrant. See United States v. Leon, 468 U.S. 897, 919-21 (1984). Under Leon, "the exclusionary rule should not be applied to exclude evidence seized pursuant to a defective search warrant if the officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate." United States v. Sharp, Civil Action File No. 1:14–cr–229–TCB, 2015 WL 4641537, at *14 n.18 (N.D. Ga. Aug. 4, 2015), adopted at *5 (citations and internal marks omitted); see also United States v. Robinson, 336 F.3d 1293, 1295-96 (11th Cir. 2003).

There are four exceptions to the Leon good-faith exception doctrine, none of which apply here:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role in the manner condemned in Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence

United States v. Henry, 939 F. Supp. 2d 1279, 1290 (N.D. Ga. 2013), adopted at 1284-85 (citation and internal marks omitted), which Sanders has not done.

entirely unreasonable; and (4) where, depending upon the circumstances of
the particular case, a warrant is so facially deficient-i.e., in failing to
particularize the place to be searched or the things to be seized-that the
executing officers cannot reasonably presume it to be valid.

United States v. Martin, 297 F.3d 1308, 1313 (11th Cir. 2002) (citation and internal

marks omitted). Sanders has not made any arguments with respect to the good faith

exception, see generally [Doc. 25], and although she has generally asserted that the

affidavit is lacking in indicia of probable cause and that the warrant is facially

deficient in failing to particularize the place to be searched and the property to be

seized, [id.], as discussed *supra*, these arguments are without merit.  In addition,

there is nothing in the record that event hints that Judge Hagy, who reviewed the

affidavit and signed the search warrant, engaged in any misconduct or abrogation

of judicial responsibility.  As discussed *supra*, the affidavit set forth sufficient

probable cause, and in any case is not "so lacking . . . as to render official belief in its

existence entirely unreasonable."  Martin, 297 F.3d at 1313 (citation omitted).

Finally, the warrant is facially valid in that it describes in sufficient detail the

things to be seized, the location for the search, and it is signed by a judge.  Officers

executing the warrant would therefore have been justified in believing in its validity,

and evidence seized during the execution would not be subject to suppression.

Massachusetts v. Sheppard, 468 U.S. 981, 981-82 (1984).   Accordingly, it is

**RECOMMENDED** that Sanders' motion to suppress evidence arising from the search of the residence, [Doc. 25], be **DENIED**.

## III. CONCLUSION

For the foregoing reasons and cited authority, Sanders' motion to sever, [Doc. 26], is hereby **DEFERRED** to the District Judge, and it is **RECOMMENDED** that Sanders' pending motions to dismiss and to suppress, [Docs. 25, 28, & 36], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 2nd day of October, 2015.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE